UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THE ESTATE OF CRISTINO D. VARGAS MENDOZA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF AUBURN, et al., <br><br> Defendants. | CASE NO. C06-455JCC <br><br> ORDER |

This matter comes before the Court on Defendants' Motion for Partial Summary Judgment on Plaintiffs' Constitutional Claims (Dkt. No. 20), Plaintiff's Opposition (Dkt. No. 27), Defendants' Reply (Dkt. No. 29), and Plaintiff's Surreply (Dkt. No. 30). The Court, having carefully considered all of the papers submitted and determined that oral argument is not necessary, hereby finds and rules as follows.

## I.  BACKGROUND AND FACTS

On April 1, 2003, Drug Enforcement Administration ("DEA") agents and the City of Auburn Police worked together to identify Plaintiffs' decedent Cristino D. Vargas Mendoza ("Vargas") as a suspected drug dealer. Upon her own arrest, a lower-level dealer Tanya Marie Simpson had identified her crack cocaine source as "Chris," a short Hispanic male who drove a green SUV with dark tinted

ORDER – 1

windows and lived in Federal Way. She told the detectives[1] that he was on his way to her location, which was a motel in Kent, Washington. Detectives set up surveillance and waited. A green SUV with dark tinted windows drove through the parking lot of the motel and left without stopping. The detectives presumed that the driver had become suspicious and left.

DEA agents arranged with the Auburn Police Department to have the green SUV stopped by marked police cars, including Defendant Sergeant Doug Faini's police dog unit and Auburn Police Officers Melton and Smith. A digital police video recording of the stop was submitted with Defendants' motion (Ashbaugh Decl. Ex. 2), and all parties substantially rely on it in discussing the relevant facts. The video begins with the stop at approximately 6:20 p.m. and ends with the ultimately unsuccessful attempt to revive Vargas around 7:08 p.m. Thus, the events in question spanned approximately fifty minutes. The camera angle shows the back of the SUV for the bulk of the footage, until the SUV drives off at approximately 6:56 p.m.

Events unfolded as follows. At approximately 6:20 p.m., Auburn Police stopped the green SUV, and at approximately 6:22 p.m., police asked its driver to turn off the vehicle. The driver—later identified as Vargas—produced a Washington driver's license, as well as an Oregon driver's license, both in the name of Bartolo Gonzalez. The driver denied that his name was Chris, and he stated that he could not produce the registration for the green SUV. However, he did say that he lived in Federal Way. In an effort to positively identify the driver before making an arrest, detectives arranged for their informant Ms. Simpson to participate in a drive-by viewing of the driver. Detectives drove her to the scene in a van, arriving at approximately 6:55 p.m. The video shows that one detective stood in front of the vehicle shining a flashlight on the driver's face. Additional detectives were on either side of the vehicle. On the driver's side stood Auburn Police Officer Ashbaugh, who instructed the driver to look toward him and the van that was about to drive by for the identification. As the van approached, a fourth, fifth, and sixth

---

[1] For simplicity, the Court will use "detectives" to refer collectively to the federal DEA agents and local police officers involved in the facts of this case.

ORDER – 2

detective approached the car and can be seen in the video. The van containing Ms. Simpson slowed down and paused next to the green SUV and then departed. The detectives on the scene then walked around the vehicle as the detectives accompanying Ms. Simpson contacted them to communicate that Ms. Simpson had positively identified the driver as "Chris," her drug supplier.

Immediately after the van departed, Vargas started the engine of the SUV. The sound of the engine starting corresponds with the police video camera's clock reading of 18:56:05. When the engine started, four detectives were standing on the driver's side, one was standing on the passenger's side, and one was standing at the left front corner of the vehicle, alternately viewable and hidden by the SUV and the others standing near the vehicle. All parties agree that the detective at the left front corner of the vehicle was Defendant Faini. However, it is not clear from the video whether any part of his body was directly in front of the vehicle or if he was entirely to the side of the vehicle when the engine started.

During the next seconds, several things happened. Upon the engine starting, the four detectives clearly on the driver's side of the vehicle all reached for the open window. Two or three detectives close enough to plunge their hands inside the vehicle did so in an apparent attempt to reach for the keys in the ignition. Defendants assert that Vargas was panicked and fighting them off as he tried to get the SUV into gear. Plaintiffs do not dispute this. Defendant Faini drew his gun and pointed it at Vargas at 18:56:06. The video shows that when he drew his gun, he was at least partially to the side of the vehicle. He then moved toward a position in front of the car, disappearing from the camera's view.

Someone yelled an inaudible command at 18:56:07. At 18:56:08 the vehicle accelerated forward,[2] another inaudible command was given, and then the first of three shots was fired. The video

---

[2] While the speed of the vehicle is not known or specifically addressed by the parties, it is clear from the video footage that the SUV was not simply rolling or idling. Rather, it accelerated out of its parked position and continued to do so.

ORDER – 3

shows that at the time the first shot was fired, the detectives still had their hands inside the vehicle.[3] All parties agree that Defendant Faini fired the shots. Defendant Faini is not visible in the video when the first shot is heard. Further, it is unclear from the video precisely where Defendant Faini was standing in relation to the vehicle, because the four detectives in the foreground block that view. The detectives on the driver's side jumped back as the vehicle continued to accelerate and Defendant Faini fired two more shots. As he fired these two shots, Defendant Faini is partially visible in the video at the far end of the group jumping back away from the vehicle. The third shot was fired as the recorder clock hit 18:56:09. The vehicle's tires squeaked as it continued to accelerate, hit the curb, and turned to the left. By 18:56:10, the vehicle was driving away from the cluster of detectives.

In support of their argument that the force used in this encounter was excessive, Plaintiffs insist that, aside from Defendant Faini, no detectives at the scene drew their weapons. While no party discusses it, the Court notes that just before the first shot was fired at 18:56:08, the video shows Auburn Police Officer Smith, on the passenger's side of the vehicle, reaching toward what appears to be her gun.

By 18:56:16, the SUV had sped away, rounded a bend, and was no longer in the camera's view. At 18:56:19, the police car with the video camera began a short chase, which ended when the green SUV came back into view approximately fifteen seconds later, stopped on the left-hand side of the road, with the single passenger exiting. Two of Defendant Faini's shots had hit Vargas, and after being removed from the vehicle and attended to medically, he was pronounced dead at the scene.

While the video depicts a clear chain of events, some specific facts remain unclear from the video alone. Most disputed is Defendant Faini's exact position when he fired the shots, particularly the first shot. The parties strenuously dispute whether he was actually in the path of the accelerating vehicle—and thus whether he was in any personal danger. Plaintiffs insist that the shots were fired from the side of the vehicle, rather than the front. In support, they refer to the medical examiner's inquest

---

[3] Plaintiffs' conclusory assertion to the contrary (Pls.' Opp'n 6; Pls.' Surreply 3) is not supported by any evidence and is directly contradicted by the video.

ORDER – 4

testimony that both shots that hit Vargas appeared to enter his body from left to right. (Carpenter Decl. Ex. E.) Additionally, Defendants assert that Defendant Faini's foot was being run over when he fired. However, Plaintiffs dispute this, citing inquest testimony of a witness who said he never saw Defendant Faini get hit by the SUV and evidence that the boots he was wearing were not marked, scratched, or dented as if they had been run over. (*Id.* Exs. C, G.) For purposes of this motion, the Court takes Plaintiffs' version of these disputed facts as true.

Plaintiffs are Vargas's estate and his son, daughter, father, and mother. They bring claims pursuant to 42 U.S.C. § 1983 for constitutional violations, as well as related state claims. On the instant motion, Defendants move for partial summary judgment, ultimately seeking dismissal of all federal claims and "remand"[4] to state court of the remaining state law claims.

## II. ANALYSIS

### A. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence

---

[4] This action was originally filed in this Court as a federal question case, 28 U.S.C. §§ 1331, 1343, alleging supplemental jurisdiction over state law claims, *id*. § 1367(a). It was never filed in or removed from state court; hence, it cannot be "remanded" back to state court. The Court construes Defendants' request for "remand" instead as a motion for dismissal of state claims pursuant to § 1367(c)(3). *See Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) ("[A] federal district court with power to hear state law claims has discretion to keep, or decline to keep, them under the conditions set out in § 1367(c).").

ORDER – 5

for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The moving party bears the burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is in fact a genuine issue for trial. *Anderson*, 477 U.S. at 250.

## B. MOTION TO STRIKE

Defendants move to strike Plaintiffs' submittal of inquest testimony in opposition to summary judgment. (Reply 1–2.) Federal Rule of Civil Procedure 56(e) states that "supporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence." FED. R. CIV. P. 56(e). A party adverse to a summary judgment motion may not rest upon allegations in the pleadings and must set forth "specific facts showing that there is a genuine issue for trial." *Id.* Defendants contend that the inquest testimony submitted by Plaintiffs' attorney is inadmissible hearsay. Defendants further argue that because the purpose of an inquest is to determine the identity of the deceased, the cause and circumstances of death, and any potential criminal responsibility for the death, an inquest may not be used to raise a factual issue on summary judgment.

In support of this latter point, Defendants cite a Fifth Circuit case, *Marker v. Prudential Ins. Co. of Am.*, 273 F.2d 258 (5th Cir. 1960), in which the Court of Appeals granted a new trial in a case where a death certificate was admitted as evidence of the cause of death and presented to the jury, but admission of an amendment thereto and testimony by the coroner was not permitted. The *Marker* court found error in the district court's failure to allow pertinent "explanation and contradiction" at trial. *Id.* at 264. Not only is the procedural posture of *Marker*—a post-trial appeal and grant of a new trial—entirely different from the instant summary judgment motion, its guiding principle actually suggests that the inquest testimony at issue here very well may raise questions that should be resolved by explanation and

ORDER – 6

contradiction at trial. *Id.* Further, while the Ninth Circuit did not squarely address the issue raised here, the Court notes that in *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365 (9th Cir. 1998), the Court of Appeals affirmed the district court's grant of summary judgment rendered after considering, *inter alia*, inquest testimony by the defendant police officer. Accordingly, the Court finds that submitting inquest testimony in opposition to summary judgment does not run afoul of Rule 56(e). Plaintiffs may use the inquest in their effort to set forth specific facts that might show a genuine issue for trial.

Similarly, the Court can find no reason to exclude the inquest testimony on the basis that it is hearsay. First, the testimony of Defendant Faini is not hearsay because it is a statement by a party opponent. FED. R. EVID. 801(d)(2). Second, inquest statements by nonparties are not being considered to establish their truth. Rather, on summary judgment, they merely demonstrate that those witnesses may be called at trial to testify to those facts. Moreover, Rule 56(e) does not require the Court to find that the inquest excerpts themselves submitted in opposition to summary judgment would be admissible at trial. Rather, Rule 56(e) simply requires summary judgment papers to "set forth such facts as would be admissible in evidence." Because the inquest witnesses could testify at a trial in this matter, there would be no hearsay problem in asking them about matters covered in the inquest testimony. Finally, the Court need not deem anything in the inquest testimony "fact" to find that Plaintiffs have raised an issue of fact. Instead, the Court merely considers whether Plaintiffs have done what Rule 56 requires of them—presentation of specific facts that could be proven or witnesses that could testify at trial. This is particularly so where, as here, the Court considers an early qualified immunity motion that precedes most discovery and all depositions.

For the foregoing reasons, the Court DENIES Defendants' motion to strike.

### C.    CONSTITUTIONAL CLAIMS

To state a claim under 42 U.S.C. § 1983, Plaintiffs must establish (1) "depriv[ation] of a right secured by the Constitution or laws of the United States" and (2) that "the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).

ORDER – 7

No party disputes the existence of the second element—both Defendants Faini and the City of Auburn are "state actors" for purposes of § 1983. Thus, the Court moves on to discuss the relevant alleged deprivation of Vargas's federal rights and Defendant Faini's claim of qualified immunity.

In the context of "government officials performing discretionary functions," as here, such officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This "qualified immunity" is determined in two steps. First, the Court must consider the threshold question of whether, taken in the light most favorable to Plaintiffs, the facts alleged show that "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Supreme Court has specified that:

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.

*Id.* The second step requires evaluation of the law in the "specific context of the case." *Id.* Accordingly, this Court must determine (1) whether Plaintiffs' facts, as alleged, could show violation of a constitutional right, and, if so, (2) whether such right was "clearly established" at the time of the incident.

**1. Scope of the Instant Motion and Applicable Constitutional Law**

Plaintiffs' Amended Complaint alleges various violations of federal rights, including the Fourth Amendment prohibition on unreasonable force (First Cause of Action), Fourth and Fourteenth Amendment rights to "bodily privacy and personal security" (Second Cause of Action), a Fourteenth Amendment right to due process in receiving "immediate provision of medical care for injuries inflicted by the defendants" (Third Cause of Action), a Fourteenth Amendment right to "love, companionship and society" of Vargas's parents and children (Fourth Cause of Action), and a "policy, practice, and custom" claim for municipal liability against the City of Auburn (Fifth Cause of Action). (Pls.' Am. Compl. (Dkt. No. 6) 10–17 ¶¶ 81–123.) Plaintiffs also bring supplemental state causes of action. (*Id.* at 17–19.)

ORDER – 8

Defendants' instant motion focuses only on the allegation that excessive force was used to effect the seizure of Vargas by gunfire—*i.e.*, Plaintiffs' First Cause of Action—and thus leaves many other causes of action in Plaintiffs' Amended Complaint unaddressed.  Nevertheless, Defendants' motion contains a footnote which states that "Plaintiff[s] also toss[] in claims under the Fourteenth Amendment," followed by a citation to the principle that excessive force cases are governed by the Fourth Amendment, not the Fourteenth Amendment, when a seizure has occurred. (Defs.' Mot. 6 n.3.)  Plaintiffs do not dispute this rule in their Opposition brief; nor does the Court. *See infra*.  Defendants argue in their Reply that Plaintiffs abandoned (presumably all of) their Fourteenth Amendment claims "by failing to address them" in the Opposition. (Defs.' Reply 2 n.1.)  Plaintiffs' Surreply asserts that the Fourteenth Amendment was "not discussed at all" in Defendants' Motion and argues that "no response was called for" as to these claims. (Pls.' Surreply 2.)

There is no question that the Fourth Amendment, and not the Fourteenth Amendment, governs the question of qualified immunity on Plaintiffs' First Cause of Action.  Excessive force claims involving arrests, investigatory stops, and other "seizures" are governed by the Fourth Amendment, which secures the right against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[A]pprehension by the use of deadly force is a seizure." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  There is no dispute about whether a seizure occurred here. (*See* Pls.' Opp'n 5–6 (noting no dispute as to whether a seizure occurred); Defs.' Mot. 6 (raising no issue as to whether a seizure occurred and proceeding immediately to analyze reasonableness under the Fourth Amendment).)  Because Vargas was seized, the Court does not need to analyze the gunshots under the Fourteenth Amendment's "shock-the-conscience" standard to determine whether the gunfire could have violated Plaintiff's substantive due process rights. *Lewis*, 523 U.S. at 843–44 (applying the Fourteenth Amendment only when the Fourth Amendment does not "cover" the claim due to lack of a "seizure").[5]  Thus, to the extent that Plaintiffs have brought Fourteenth

---

[5] Until the applicability of the Fourth Amendment is determined as a matter of law according to *Lewis*, a request for alternative analysis may be implied in Plaintiffs' First Cause of Action, even though

ORDER – 9

Amendment claims regarding excessive use of force on Vargas, they cannot survive.

However, Plaintiffs' various Fourteenth Amendment claims regarding Vargas's substantive due process rights and the provision of medical care to him, as well as substantive due process claims that his family members may have, are not now before the Court. While Plaintiffs' assertion that Defendants "did not mention" the Fourteenth Amendment claims is technically incorrect due to Defendants' footnote regarding the standard in excessive force cases, the Court finds that, apart from this aspect of the Fourteenth Amendment as a potential alternative to the Fourth Amendment, no Fourteenth Amendment claims were addressed on their merits in Defendants' motion. Accordingly, the Court will not dismiss such claims in ruling on the excessive force issue. To the extent that Plaintiffs brought a Fourteenth Amendment claim regarding excessive force as an alternative to their First Cause of Action alleging a Fourth Amendment violation, it is DISMISSED. Additional Fourteenth Amendment claims pled in the Second, Third, Fourth, and Fifth Causes of Action remain because they are legally distinct and were not addressed in Defendants' qualified immunity motion. Further, municipal liability claims are implicated here only so far as they incorporate or rely on the alleged Fourth Amendment Excessive Force Claim.

### 2. Fourth Amendment Excessive Force Claim

In the instant case, the first step in the qualified immunity analysis under *Saucier* is to determine whether Plaintiffs have raised material issues of fact that would enable them to prove that the seizure of Vargas was unconstitutional under the Fourth Amendment. The test under the Fourth Amendment is whether the force used in a seizure was "objectively reasonable." *Graham*, 490 U.S. at 388. This calculus "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations omitted). The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The

---

on its face it invokes only the Fourth Amendment.

ORDER – 10

"reasonableness" inquiry is objective and does not take into account the officer's "underlying intent or motivation." *Id.* at 397. On the facts of this case, the relevant question in the Fourth Amendment analysis is whether the gunshots that struck Vargas resulted from a reasonable exercise of deadly force.

The threshold determination for the Court in considering whether there could be a constitutional violation on Plaintiffs' facts is whether to analyze the three shots as one event or as two or three separate events. Plaintiffs argue that the third shot was unconstitutional, even if the first two were justified. Defendants generally decry splitting up the shots for analysis, but no party discusses how the Court should approach this determination.

In some cases, separate uses of deadly force may be analyzed separately under the Fourth Amendment. *See, e.g.*, *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992), *rev'd on other grounds as recognized in Felderman v. County of Kern*, 61 Fed. Appx. 438 (9th Cir. 2003) (noting that the *Hopkins* court's qualified immunity inquiry has been superseded by the two-step process of *Saucier*), *and Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994) (noting that the *Hopkins* court's suggestion that alternatives should be considered even when deadly force is justified is incorrect). However, this is not such a case. Here, the Court has the benefit of hearing just when and how fast the shots were fired. The shots captured by the police video are in rapid succession, with even spaces between them. Plaintiffs do not dispute this, yet they still argue that at least the third shot should be treated separately. Rather than a comparably longer pause of minutes, or even seconds, between the second and third shots, there is no audible difference between the spacing of the first and second shots, as compared with the second and third shots. Moreover, it is undisputed that all three shots were fired in less than two seconds. The Court can find no reason to treat this split-second occurrence as more than one event for purposes of the Fourth Amendment analysis.

Having determined that the volley of three shots constituted a single exercise of deadly force, the Court turns to whether that use of force was reasonable. The "objective reasonableness" standard of *Graham*, cited *supra*, has been further refined in cases involving a fleeing felon, such as here. In 1985,

ORDER – 11

the Supreme Court held in *Tennessee v. Garner* that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. . . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 471 U.S. at 11.  However, if an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* Moreover, whether officers used objectively reasonable force "depends on several factors, including the severity of the crime that prompted the use of force, the threat posed by a suspect to the police or to others, and whether the suspect was resisting arrest." *Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006) (citing *Graham*, 490 U.S. at 396).

It is undisputed that once Vargas started his vehicle, he was a fleeing felon. He had just been positively identified as an upper-level crack cocaine trafficking suspect. Moreover, Plaintiffs concede that he was "attempting to avoid arrest by leaving in his vehicle." (Pls.' Opp'n 3.) Plaintiffs do not dispute that there was probable cause to arrest Vargas at the time of the shooting. Thus, while the crime might not be as severe as one necessarily involving weapons or violence, the suspect was resisting arrest. However, the central dispute is whether Vargas posed a threat serious enough to justify deadly force. Here, where Defendant Faini claims that a dual threat existed—to himself as well as to fellow detectives—the Court must analyze both.

As an initial matter, Plaintiffs emphasize that Vargas did not have a weapon on his body or inside the vehicle. (Pls.' Opp'n 3.) This is irrelevant, however, because it is well established that a vehicle can be a deadly weapon. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (§ 1983 context); *United States v. Aceves-Rosales*, 832 F.2d 1155, 1157 (9th Cir. 1987, *cert. denied*, 484 U.S. 1077 (1988) (criminal conviction context). Accordingly, the analysis here focuses on whether Vargas's use of his vehicle posed a serious and imminent threat to physical safety.

//

ORDER – 12

Taking Plaintiffs' facts as true for purposes of summary judgment, Defendant Faini's foot did not get run over, he was not physically contacted by the vehicle, and he was not standing in the path of the accelerating vehicle. Thus, the Court finds that a genuine issue of fact would exist on the Fourth Amendment question if Officer Faini had *only* fired the shots to protect his own safety. However, Defendant Faini also claims that he perceived a serious threat to his co-detectives, because they were at risk of being dragged along with the vehicle or knocked down and run over as Vargas drove away. Thus, presuming the existence of a material issue of fact as to Defendant Faini's own safety, the dispositive question is whether a reasonable officer on the scene would have been worried at least about the safety of the other detectives, particularly those with their arms reaching inside the vehicle.

Several facts are important in determining the threat to the detectives reaching into the vehicle. First, as noted *supra*, four detectives reached for the open driver's side window when Vargas started the SUV. At least two were close enough to get their arms inside. The others were approximately a foot away from the vehicle, if not touching it. When the vehicle started, Defendant Faini was either in front of the vehicle or to the side. Taking Plaintiffs' facts as true, he was fully to the side and was not in the path of the vehicle.[6] Regardless of his precise position, the video footage substantiates Defendant Faini's claim that he perceived the other detectives' arms inside the vehicle before he fired the first shot, because he was undoubtedly close enough to see them. It is also undisputed that two verbal commands were given before the first shot was fired. While it is unclear what exactly was said, Defendants claim that detectives were ordering Vargas to stop. Plaintiffs do not dispute this. The fact that a suspect ignored warnings supports a finding that subsequent use of deadly force was objectively reasonable and that officers had probable cause to believe that the suspect posed a threat of serious physical harm to themselves or others. *Blanford v. Sacramento County*, 406 F.3d 1110, 1116–18 (9th Cir. 2005) (analyzing incident that occurred in 2000). In this regard, the undisputed facts show that it would have

---

[6] Indeed, this position could have given him a *better* view of his fellow detectives than if he would have been in front or partially in front of the vehicle.

ORDER – 13

been reasonable for Defendant Faini to surmise that Vargas would continue to accelerate in spite of the verbal commands to stop.

Plaintiffs assert that Vargas was merely attempting to escape arrest, not run down police officers or drag them to death. However, it is not Vargas's state of mind that is important here. Instead, the inquiry focuses on the perception of a *reasonable officer on the scene*.

Plaintiffs also focus on the fact that all detectives' arms were out of the vehicle by the time Defendant Faini fired the second and third shots. However, as discussed *supra*, the shots must be considered as one event because of their rapid succession. Thus, it is immaterial that the facts changed during those two seconds. If the first shot was justified based on a threat to others, then all three were so justified.

Similarly, it is irrelevant that the detectives were not in fact dragged or that they did in fact get away from the vehicle before it moved very far. The question is not whether anyone was injured in hindsight, but rather whether a reasonable officer on the scene would perceive a risk of serious physical harm. When Defendant Faini started firing, he did not know that after his first shot the detectives would clear the vehicle.

Furthermore, the threat in this case was serious physical injury that could result from being dragged or from being knocked down and run over. The latter could have occurred regardless of whether the detectives freed themselves from inside the vehicle. The footage of Vargas's vehicle turning to the left as it accelerated away from the cluster of detectives emphasizes the acute risk to those detectives standing on the left side of the vehicle. Because the right-hand curb made the likely egress path toward traffic lanes forward and to the left, the Court finds that even before this left turn actually occurred—*i.e.*, when the shots were fired—the threat to the detectives would have been clear as well as sufficiently serious in the eyes of a reasonable officer on the scene. Also persuasive is the fact that the detectives, whom Defendant Faini claims he was worried about being dragged or run over, were identifiable as well as in close proximity to both Defendant Faini and the threat. Defendant Faini knew

ORDER – 14

the exact location of the potential victims, and he was watching the threat escalate.

In short, split-second decisionmaking, the close proximity of specific detectives to the accelerating vehicle, the fact that detectives clearly had their arms inside the vehicle, the audible and unheeded verbal commands prior to shots being fired, the rapid discharge of shots, and the overall circumstances of the traffic stop for a felony drug arrest make it clear to the Court that there was, as a matter of law, probable cause to believe that Vargas and his vehicle posed a threat of serious physical harm to the detectives partially inside the SUV and struggling to get Vargas's keys out of the ignition. Accordingly, the Court finds that a reasonable officer on the scene would have been justified in using deadly force to prevent the perceived threat of at least two detectives being dragged or run over by an accelerating vehicle driven by a panicked drug trafficking suspect who had just been identified by an informant at the end of a thirty-minute traffic stop. Because of the imminent and substantial risk of danger to other detectives, the use of deadly force by Defendant Faini did not violate the Fourth Amendment. Plaintiffs have not submitted sufficient evidence to raise a material issue of fact for trial as to this issue.

Having determined that Plaintiffs have not alleged a Fourth Amendment violation, the Court need not reach the second prong of the qualified immunity analysis. Defendant Faini is entitled to qualified immunity on the Fourth Amendment issue. The Fourth Amendment claim against him in his official capacity, as well as any municipal liability claims against the City of Auburn stemming from the alleged Fourth Amendment violation shall be DISMISSED.

### III. CONCLUSION

For the reasons set forth in this Order, Defendants' Motion for Partial Summary Judgment is hereby GRANTED IN PART. Defendant Faini is entitled to qualified immunity on the Fourth Amendment issue. The Fourth Amendment claim against Defendant Faini in his official capacity, as well as any municipal liability claims against the City of Auburn stemming from the alleged Fourth Amendment violation are DISMISSED. All other federal and state claims not at issue on this motion remain. Because federal claims remain, the Court has no occasion to consider dismissal of state claims pursuant to

ORDER – 15

28 U.S.C. § 1367(c).

SO ORDERED this 22nd day of February, 2007.

/s/ John C. Coughenour
John C. Coughenour
United States District Judge

ORDER – 16